UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
FOREST LABORATORIES, INC.,                          :
                                                    :
                            Plaintiff,              :   Index No. 07 CV 7399(AKH)
                                                    :
                                                    :
                - against -                         :
                                                    :
                                                    :
  LEIF NISSEN,                                      :
                                                    :
                                                    :
                            Defendant.              :
----------------------------------------------------------------------x


**PLAINTIFF'S PRE-TRIAL MEMORANDUM OF LAW**



                            LAW OFFICES OF CHRISTOPHER SERBAGI
                            488 Madison Avenue, Suite 1120
                            New York, New York  10022
                            (212) 593-2112

                            Attorneys for Plaintiff

On the Brief:
Christopher Serbagi, Esq.

# TABLE OF CONTENTS

**Page**

INTRODUCTION............................................................................................................1

PRELIMINARY STATEMENT.....................................................................................1

PROCEDURAL HISTORY.............................................................................................4

STATEMENT OF FACTS...............................................................................................5

ARGUMENT..................................................................................................................10

I.     The Defendant Violated The Anti-Cybersquatting Consumer Protection Act............................10

       A.     LEXAPRO Was Inherently Distinctive When Defendant Registered Lexipro.com...........................................................................................10

       B.     Defendant Uses And Traffics In A Domain Name Identical Or That Is Confusingly Similar to LEXAPRO.....................................................................12

       C.     Defendant Had A Bad Faith Intent To Profit From LEXAPRO............................13

           1.     The Defendant Had No Trademark Or Other Intellectual Property Rights in Lexipro.com Either Upon Registration Or At Any time Thereafter..................................................................................................14

           2.     Lexipro.Com Does Consist of the Defendant's Legal Name.......................14

           3.     Defendant Has Never Used Lexipro.Com in Connection With The Bona Fide Offering Of Any Goods Or Services.................................................14

           4.     The Defendant Has Never Used the Mark In A Non-Commercial Fair Use Manner.....................................................................................................15

           5.     Defendant Intended to Divert Consumers From Forest's LEXAPRO Web Site To Defendant's Lexipro.com Site For Commercial Gain............................15

           6.     The Defendant Made Repeated And Unsolicited Offers to Sell Lexipro.Com to Forest Without Ever Having Had An Intent To Use the Domain Name In The Bona Fide Offering Of Goods or Services.....................................16

           7.     The Mark Incorporated Into Lexipro.Com Is Distinctive and Famous............17

       D.     The Court Should Award Forest $100,000 of Statutory Damages and Its Attorney's Fees......................................................................................18

       E.     The Court Should Transfer Lexipro.Com to Forest.........................................19

II.     The Defendant Committed Federal Trademark Infringement Under 15 U.S.C. § 1114 and Federal Unfair Competition Under 15 U.S.C . § 1125.........................................................19

i

III.    Defendant's Registration and Use of "Lexipro.Com" Constitutes Common Law Trademark
        Infringement and Unfair Competition…………………………………………………………..23

IV.     Defendant's Registration and Use of "Lexipro.Com" Constitutes Deceptive Trade Practices Under
        N.Y. Gen Bus. Law § 349…………………………………………………………………………..23


CONCLUSION…………………………………………………………………………………...........25

Declarations

     1.     Declaration of Christopher Serbagi, dated August 20, 2007
     2.     Second Declaration of Christopher Serbagi, dated August 21, 2007
             Ex. A
     3.     Third Declaration of Christopher Serbagi, dated August 28, 2007
             Exs. A-C
     4.     Declaration of Eric Agovino, dated August 17, 2007
             Exs. A-G
     5.     Second Declaration of Eric Agovino, dated August 28, 2007
             Exs. A-L

Affidavits

     1.     Affidavit of Sigmund Solares, dated August 27, 2007
             Exs. A-C

TABLE OF AUTHORITIES

Page

CASES:

1800 Contacts, Inc. v. WhenU.com, Inc. and Vision Direct, Inc., 309 F.Supp.2d 467
 (S.D.N.Y. 2003)……………………………………………………………………………..51

Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir.1976)…………………..11

Baker v. Parris, 777 F. Supp. 299, 304 (S.D.N.Y. 1991)…………………………………………25.

Big Star Entertainment, Inc. v. Next Big Star, Inc., 105 F. Supp.2d 185 (S.D.N.Y. 2000)………21, 22

Bihari v. Gross, 119 F.Supp.2d 309 (S.D.N.Y. 2000)……………………………………………21

Cable News Network L.P. v. CNNEWS.com, 177 F. Supp2d 506 (E.D. Va. 2001)…………….16

Cohen v. JP Morgan Chase & Co., No. 06-0409, 2007 WL 2231106 (2d Cir. August 6, 2007….25

Collins v. Aztar Corp., No. 99 Civ. 7912, 2000 U.S. App. LEXIS 4484 (2d Cir. Mar. 20, 2000)..23

Clinique Laboratories, Inc. v. DEP Corp., 945 F. Supp. 547 (S.D.N.Y. 1988)…………………19

Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503 (2d Cir. 1997)……………………………….22

Eurotech, Inc. v. Cosmos European Travels Akitiengesellschaft, 213 F. Supp.2d 612
 (E.D. Va 2002……………………………………………………………………………….16

Freedom Calls Foundation v. Bukstel, No. 05 CV 5460 (SJ) (VVP), 2006 U.S. Dist. LEXIS
19685 (E.D.N.Y. March 3, 2006)………………………………………………………….17

Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137(2d Cir. 1997)…………………23

Grotrian, Hellferich, Schulz, th. Steinweg Nachf. V. Steinway & Sons, 523 F.2d 1331
(2d Cir. 1975)……………………………………………………………………………….20

Gruner & Jahr USA Pub. V. Merredith Corp., 991 F.2d 1072 (2d Cir. 1993)……………………19

Hard Rock Café. Int'l. (USA) Inc. v. Morton, No. 97 Civ. 9483, 1999 U.S. Dist. LEXIS 13760
(S.D.N.Y. Sept. 8, 1999)…………………………………………………………………….23.

Harrods Ltd. v. sixty Internet Domain Names, 157 F. Supp.2d 658 (E.D. Va. 2001)…………..16

Jordache Enters., Inc. v. Levi Strauss & Co., 841 F. Supp. 506 (S.D.N.Y. 1993)………………20

Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996 (2d Cir. 1995)…………………………………..11

Lewittes v. Cohen, 2004 U.S. Dist. LEXIS 9467, No. 03 Civ. 189 (S.D.N.Y. May 26, 2004)…..10

Lois Sportswear, USA v. Levi Strauss & Co., 799 F.2d 867 (2d Cir. 1986)……………....….20

Mashantucket Pequot Tribe v. Redican, 403 F. Supp.2d 184 (D. Conn. 2005)…………..…….16

Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254 (2d Cir. 1987)………………19, 20, 21, 22

Nabisco v. PF Brands, Inc., 191 F.3d 208 (2d Cir. 1999)………………………………………...11

New York State Soc. Of Certified Public Accountants v. Eric Louuis, Inc., 79 F. Supp.2d 331 (S.D.N.Y. 1999)………………………………………………………………………………...21

Omega S.A. v. Omega Engineering, Inc., 228 F. Supp. 2d 112 (D. Conn. 2002). ……………….12

Pfizer, Inc. v. Y2K Shipping & Trading, Inc., No. 00-cv-5304, 2004 WL 896952 (E.D.N.Y. March 26, 2004)……………………………………………………………………….24.

Polaroid Corp. v. Polarad Electronics, Corp., 287 F.2d 492 (2d Cir. 1961)………………...12, 22

Safeway Stores, Inc. v. Safeway Props., Inc., 307 F.2d 495 (2d Cir. 1962)………………………24

Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256 (2d Cir. 1995)…………………………24.

Sporty Farms L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489 (2d Cir. 2000)…………………10

TCIP Holding Co. v. Haar Communications, Inc., No. 99 Civ. 1825 (RCC), 2004 WL 1620950 (S.D.N.Y. July 19, 2004)…………………………………………………………………10, 13, 17

The Mashantucket Pequot Tribe v. Redican, Jr., 403 F. Supp2d 184 (D. Conn. 2005)…………..46

Victoria's Cyber Secret Ltd. P'ship v. V Secret Catalogue, Inc., 161 F. Supp.2d 1339 (S.D. Fla. 2001)………………………………………………………………………………16

Wella Corp. v. Wella Graphics, Inc., 874 F. Supp. 54 (E.D.N.Y. 1994)…………………………13

STATUTES

15 U.S.C. § 43(a)………………………………………………………………………...2, 19

15 U.S.C. §§ 1057(b)……………………………………………………………………………19

15 U.S.C. §§ 1115(a)……………………………………………………………………………19

15 U.S.C. § 1117(a)……………………………………………………………………………1, 17

15 U.S.C. § 1117(d)……………………………………………………………..1, 17

15 U.S.C. § 1125(d)……………………………………1,10, 12, 13, 14, 15, 16, 17, 19

15 U.S.C. § 1125(d)(1)(B)(i)(I)……………………………………………………14

15 U.S.C. § 1125(d)(1)(B)(i)(III)…………………………………………………14

15 U.S.C. § 1125(d)(1)(B)(i)(IV)…………………………………………………15

15 U.S.C. § 1125(d)(1)(B)(i)(V)…………………………………………………15

15 U.S.C. § 1125(d)(1)(B)(i)(VII)…………………………………………………17

15 U.S.C. § 1125(d)(1)(C)……………………………………………………1, 19

N.Y. Gen. Bus. Law §§ 349-50………………………………………………………1

Plaintiff Forest Laboratories, Inc. ("Forest") respectfully submits this pre-trial memorandum of law in advance of the hearing scheduled for September 11, 2007.

## INTRODUCTION

Forest filed this action because Defendant registration and used the domain name "lexipro.com" to improperly profit from the good will associated with Forest's registered and highly distinctive mark LEXAPRO®. Forest's Complaint asserts the following causes of action (i) the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. §1125(d) ("ACPA"); (ii) Federal Trademark Infringement under 15 U.S.C. § 1114; (iii) the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c); (iv) False Designation of Origin, False Description, and Unfair Competition under 15 U.S.C. § 43(a)); (v) Common Law Unfair Competition; and (vi) the Unfair Trade Practices Act, N.Y. Gen. Bus. Law §§ 349-50. This Pre-Trial Memorandum sets forth the facts that Forest intends to prove at trial as well as the applicable law.

For the reasons set forth below, Forest requests statutory damages of $100,000 as provided by 15 U.S.C. § 1117(d), its reasonable attorney's fees on grounds that this is an exceptional case, as provided by 15 U.S.C. § 1117(a), an Order that the Court transfer the domain name "lexipro.com" to Forest, as provided in 15 U.S.C. § 1125(d)(1)(C), and for such other relief that the Court may deem just and proper.

## PRELIMINARY STATEMENT

Defendant Leif Nissen is far worse than a classic cybersquatter because his use of the domain name "lexipro.com" has damaged not only Forest and its valuable LEXAPRO® mark, but has contributed to a well recognized and significant public safety concern. Defendant used "lexipro.com" as a "pay-per-click" site to post advertisements, so that when Internet users typed "lexipro.com" as a web address, they were directed to, inter alia, advertisements for dangerous

on-line pharmacies. Not only did Defendant know about these advertisements because they were prominently displayed on this site, but he specifically chose the keyword "depression" to attract those advertisements. Defendant could have directed that illegal on-line pharmacies be removed from his site, but his desire to profit from the good will associated with LEXAPRO® outweighed any concern he might have had that his activities were dangerous and at the very least, contributing to violations of federal criminal law.

Plaintiff's claim at the August 21, 2007 hearing that he coined the term "lexipro.com" without knowing about Forest's LEXAPRO® mark is not credible because the mark is entirely arbitrary and distinctive. By the time that Defendant registered "lexipro.com," LEXAPRO® was heavily touted in the press, including numerous on-line articles about the unique efficacy associated with the drug. Forest had already conducted its clinical trials for LEXAPRO®, filed its intent-to-use trademark application with the PTO, filed its New Drug Application with the FDA, and registered the domain name "lexapro.com." In fact, Defendant registered "lexipro.com" one day after Forest issued a well publicized press release announcing the FDA's "approvable letter," which is the final stage before a company receives FDA clearance to market a product in the United States. To say that Defendant independently coined "lexipro.com" without knowing about LEXAPRO® defies reason.

Whether or not Defendant initially registered the domain name "lexipro.com" in bad faith is irrelevant because the issue for all the causes of action in the Complaint is how he used the domain name in commerce. There is no question that Mr. Nissen used "lexipro.com" in bad faith because (i) he admitted at the August 21, 2007 hearing to knowing that he had a "problem" only two months after he registered the domain because it was then that he learned about LEXAPRO®; (ii) he admitted at the August 21, 2007 hearing to waiting to use "lexipro.com" for

two years because he "wanted to see how LEXAPRO® with a different spelling was to be used" and he started using the domain soon after LEXAPRO® became well known; (iii) he chose the keyword "depression" so that individuals interested in LEXAPRO® would be directed to his site; (iv) his "lexipro.com" web site contained advertisements for rogue on-line pharmacies (and other unauthorized advertisements) for which he received revenue; (v) he tried to sell the domain name to Forest on at least three different occasions; and (vi) he never once used "lexipro.com" in connection with a bona fide business and never attempted to obtain any intellectual property protection in the mark.

Defendant could have told Judge Swain the truth at the August 21, 2007 hearing by simply stating that he made a mistake. Instead, to compound the injury he misrepresented the facts to Judge Swain by repeatedly claiming that he acted in good faith and always intended to use the domain in connection with a legitimate business. Forest's investigation subsequent to the hearing uncovered that on May 23, 2007, Defendant had directed the company Parked.Com to employ the keyword "depression" so that related advertisements would appear on his site. Defendant obviously chose that keyword so that individuals interested in LEXAPRO® would visit his web site. Defendant profited from the consumer confusion he created. Moreover, as set forth in an affidavit from Parked.Com's Chief Executive Officer, Defendant's choice of the keyword "depression" led Parked.Com's automated system to add the key words LEXAPRO® and CELEXA®, both of which are Forest registered trademarks. Defendant undoubtedly saw those results. Thus, by representing to Judge Swain that he had no control over what appeared on his site and that he acted in good faith was outright perjury. Even without this undisclosed information, Judge Swain held that Defendant had misused Forest's intellectual property, improperly benefited from the confusion it has caused in the marketplace, contributed to a public

3

safety concern, and was likely to lose on the causes of action in the Complaint. Incredibly, on the eve of Judge Swain's Order, Defendant wrote to Forest again and requested a "fair payout."

Increased damages and attorney's fees are warranted under these egregious circumstances because Defendant's greed was so heavy that he was entirely unconcerned with the threat to public safety caused by his promotion of dangerous on-line pharmacies on his website. Defendant's acts far surpass the legal standards for civil liability set forth in the Complaint. Defendant's actions are in such bad faith and so dangerous that if increased damages are ever warranted, they are warranted here, especially since Forest provided Defendant multiple opportunities to cease and desist prior to filing suit. Defendant responded to Forest's good faith efforts to avoid this litigation and avoid burdening the Court by threatening to sell "lexipro.com" to pornographic webmasters in Pakistan unless Forest succumbed to his extortion. That he made these threats in writing only underscores his audacity.

## PROCEDURAL HISTORY

On August 20, 2007, Forest filed a Summons and Complaint and moved by order to show cause for a temporary restraining order and preliminary injunction. On that day, Judge Loretta Taylor Swain Ordered that Plaintiff serve the Defendant with the summons, Complaint, and the supporting TRO documents by electronic communication. Forest complied with Judge Swain's request and Defendant admitted to receiving those documents on August 21, 2007. On August 21, 2007, Judge Swain (i) granted Forest's motion for a temporary restraining order in its entirety, which shut down the "lexipro.com" site until further Order of the Court; (ii) Ordered that Forest submit its preliminary injunction papers on August 23, 2007, that Defendant submit its opposition papers on August 30, 2007 and that Forest submit its reply papers on September 4, 2007; (iii) Ordered that Forest post a bond of $25,000 on August 22, 2007, which Forest has

done; and (iv) Ordered that the parties attend a preliminary injunction hearing on September 5, 2007. By Order dated August 22, 2007, Judge Swain granted Forest's request that the preliminary injunction hearing be combined with a trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2), which would take place on September 11, 2007. The Judge also provided the Plaintiff until August 28, 2007 to submit its trial memorandum of law.

## STATEMENT OF FACTS

Forest is a New York based pharmaceutical company that produces and markets drugs that treat a variety of conditions. Declaration of Eric M. Agovino, ¶ 4 ("Agovino Decl."). Forest has well-established franchises in therapeutic areas of the central nervous system, cardiovascular, and respiratory systems. Id. Forest's blockbuster product is the anti-depressant drug LEXAPRO®. Id. at ¶ 5. LEXAPRO® has been prescribed for more than 15 million adults in the United States for the treatment of depression and generalized anxiety disorder ("GAD") in adults. Id. Currently, more than 19 million American adults suffer from depression and 4 million American adults suffer from GAD. Id.

On December 22, 2000, Forest filed an intent-to-use application with the United States Patent and Trademark Office ("PTO") for the mark LEXAPRO® for "pharmaceutical preparations, namely antidepressants," which means that Forest is entitled to presumptive use from that date forward. Id. at ¶ 6. Forest registered and obtained rights to the domain name "lexapro.com" on January 22, 2001. Id. at ¶ 7.

Based on the success of pre-clinical and clinical trials, the safety and efficacy of LEXAPRO® was heavily touted in the press throughout 2001 as a blockbuster product, offering potency and efficacy not then available. Agovino Decl. at ¶ 8.

On March 23, 2001, Forest submitted a new drug application with the United States Food

5

and Drug Administration ("FDA"), which was heavily touted in the press.  Agovino Decl. at ¶ 9.

On January 24, 2002, Forest disclosed that it had received an "approvable" letter from the FDA for LEXAPRO®, which represents the final stage before a company receives FDA clearance to market a drug in the Unites States.  Second Declaration of Eric M. Agovino (Agovino Decl.) ¶ 4.  The very next day after Forest had achieved significant press for LEXAPRO® and after it had filed its intent-to-use application for LEXAPRO®, the Defendant Mr. Leif Nissen registered and obtained rights to the domain name "lexipro.com." Agovino Decl., ¶ 10.  "Lexipro" is a common misspelling for Forest's LEXAPRO® mark and, on information and belief, Mr. Nissen registered "lexipro.com" only because he sought to capitalize on the good will that LEXAPRO® brand has obtained in the marketplace.  Id. at ¶ 10.

Forest's LEXAPRO® mark is extremely well known.   In 2003, Forest sold $244,730,000 of LEXAPRO® product and had a market share of 12% of the antidepressant market; in 2004, LEXAPRO® had sales of $1,088,957,000 and a 16.7% market share; by 2005 LEXAPRO® had sales of $1,605,296,000 with a 19.0% market share; by 2006 LEXAPRO® had sales of $1,873,255,000 with a 20.1% market share; and in 2007 LEXAPRO® has had $2,105,999,000 and an 17.5 market share.  LEXAPRO® sales to date are: $6,918,228,000. Second Declaration of Eric Agovino at ¶¶ 6-11 .

On February 4, 2003, the PTO issued a federal registration for LEXAPRO® (Reg. No. 2,684,432).  First Agovino Dec. at ¶ 11.  In early August 2007, it came to Forest's attention through its marketing department that someone had registered and was making improper use of the domain name "lexipro.com." Id. at ¶ 13.  In particular, "lexipro.com" was linked to, *inter alia*, a number of on-line pharmacies that are making unauthorized sales of drugs that purport to be LEXAPRO®, both in the United States and in other countries.  These online and rogue

6

pharmacies are engaging in willful patent infringement, trademark infringement, and other violations of Forest's valuable intellectual property. Agovino Decl., ¶ 13. Even worse, the sale of unregulated drugs by rogue online pharmacies presents a well established public safety issue. Id.

Forest's further investigation disclosed that "lexipro.com" is registered to an individual by the name of Leif Nissen, the Defendant in the present action. Id. at ¶ 14. On August 1, 2007, Forest wrote to Mr. Nissen and requested that he cease and desist from his unlawful activities in connection with his use of the domain name "lexipro.com." Id. On August 1, 2007, Mr. Nissen wrote back to Forest and falsely stated that he had the "lexipro.com" domain name before the Forest product LEXAPRO® existed. Id. at ¶ 15. Mr. Nissen also admitted to placing "lexipro.com" on a pay-per-click site called "Parked.Com." Id. at ¶ 15.

Parked.Com is an on-line advertising business that services owners of domain names. Affidavit of Sigmund Solares, ¶ 1. Both Parked.Com and Defendant Nissen collected advertising dollars each time someone clicks on an advertised site, which in turn provide a portion of those monies to those who own the particular domain names in question, like Mr. Nissen. Id. at ¶ 4. Thus, when someone types "www.lexipro.com" as a web address the user thinks that he/she will locate sites that are sponsored by Forest in connection with the name LEXAPRO®. Id. Instead, the user is directed away from Forest's LEXAPRO® brand and directed to a variety of rogue on-line pharmacies and other sites. In order to increase the likelihood that those interested in depression in general and LEXAPRO® in particular were directed to Mr. Nissen's "lexipro.com" web site, Defendant selected the primary keyword "depression." Id. at 6. As a result of Defendant's selection of the keyword "depression," the Parked system selected the additional keywords "LEXAPRO®" and "CELEXA®," both of

which are registered Forest trademarks. Id. at ¶ 7. Those advertisers who bid on the word

"lexipro" were prominently displayed on the "lexipro.com" website, including advertisers for on-

line pharmacies. Id. at ¶¶ 9, 11. From May 23, 2007 until the domain name "lexipro.com" was

shut down by Order of Judge Swain, the domain name "lexipro.com" had 1,410 visitors with

1,243 verified clicks. Id. at ¶ 10.

     In Mr. Nissen's August 1, 2007 electronic communication to Forest, he offered to sell the

"lexipro.com" domain name to Forest for $10,000 or he would sell the name to offshore

companies. Agovino Decl., ¶ 16.

     On or about August 14, 2007, Forest's outside trademark counsel sent a cease and desist

letter to the pay-per-click site "Parked.Com" and demanded that it cease providing services in

connection with "lexipro.com." Id. at ¶ 17. That same day, Parked.Com terminated its

relationship with Mr. Nissen. Id. at ¶ 18.

     On August 14, 2007, Mr. Nissen wrote to Forest again via electronic communication,

and stated:

> Well, you've gotten parked.com<http://parked.com> to stop
> running ads on the site. Being that you're being so reasonable,
> maybe I'll sell it to a webmaster in Pakistan who will put a porn
> site on it. Let's start being reasonable here before I do something
> stupid. There are 10+ domain parking companies if that's really
> the tactic you want to take.

Id. at ¶ 19. On or about August 14, 2007, Mr. Nissen made true on his threat and displayed the

"lexipro.com" domain name on another pay-per-click site called SEDO. This new site also links

users to rogue on-line pharmacies that sell bootleg LEXAPRO®. Id. at ¶ 20. Both SEDO and

Defendant Nissen have received advertising dollars in connection with their improper activities.

Id. at ¶ 20.

     On August 21, 2007, Judge Loretta Taylor Swain heard Forest's application for a

8

temporary restraining order that would require the Defendant and the Registrar of "lexipro.com" to de-activate the domain name pending a full hearing. Third Declaration of Christopher Serbagi ("Serbagi Decl."), ¶ 2. Both parties appeared and presented their arguments in open court. Id. Defendant brazenly declared that it was not until after he registered lexipro.com that he tried to capitalize on the LEXAPRO®'s good will. Id. at Ex. A, p. 5, lines 10-18. Defendant stated:

> I will point out that as mentioned in the injunction, I have never actually developed a domain name. **I actually, I didn't find out until a few months after buying it that it was probably going to be a problem with the fact that there was a drug named for it or with a different spelling or the domain.** So I just held onto it for two years. I did nothing with it. I wanted to see how LEXAPRO® with a different spelling was to be used. I put up some ad code so people could make money with it.

Id. (emphasis added).

Based on the evidence presented at the hearing, Judge Swain held that (i) Forest was likely to succeed in its trademark infringement, dilution, and cybersquatting causes of action; (ii) there was evidence of consumer confusion; (iii) that Defendant was obtaining revenue based on that consumer confusion; (iv) there was irreparable harm, not only caused by misuse of Forest's intellectual property, but a broader public safety issue caused by the use of lexipro.com to sell unauthorized and unregulated versions of the brand drug. Id. at Ex. B. In particular, Judge Swain held:

> I find that the proffer here and the facts as they have been explained are indicative of a likelihood of success in the merits of the plaintiff's trademark infringement, dilution and anti-cybersquatting causes of action insofar as there is evidence of consumer confusion, there is evidence of use of the Lexipro domain name to obtain revenue whose source really is that consumer confusion. And there is, in terms of irreparable harm, not only the irreparable harm that by definition exists in the context of misuse of intellectual property, but also a broader public safety issues with respect to the availability of Lexipro domain name as a channel unauthorized and unregulated versions or

9

> purported versions of the name brand drug.  Accordingly, I will
> sign the order as proposed.

Id.

The Defendant was undeterred by Judge Swain's well reasoned admonitions.  On the eve

of Judge Swain's Order, Defendant again reiterated his requirement that Forest provide him a

"fair payout."  Id. at ¶ 4, Ex. C.

## ARGUMENT

I.    **The Defendant Violated The Anti-Cybersquatting Consumer Protection Act**

To prevail under the Anti-Cybersquatting Consumer Protection Act ("ACPA")[1], a

plaintiff must show: (1) that it owns a distinctive or famous mark that was distinctive when the

Defendant registered the domain name at issue; (2) the domain name registrant registers, uses, or

traffics in a domain name that is identical or confusingly similar to the trademark owner's mark;

and (3) the domain name registrant had a bad faith intent to profit from the trademark owner's

mark. 15 U.S.C. § 1125(d)(1)(A).  TCIP Holding Co. v. Haar Communications, Inc., No. 99 Civ.

1825 (RCC), 2004 U.S. Dist. LEXIS 13543, *14 (S.D.N.Y. July 19, 2004); Sporty Farms L.L.C.

v. Sportsman's Market, Inc., 202 F.3d 489, 496 (2d Cir. 2000).

A.    **LEXAPRO® Was Inherently Distinctive When Defendant Registered
Lexipro.com**

In the Second Circuit, the inherent distinctiveness of a trademark is traditionally

---

[1] The purpose of the ACPA "was to respond to concerns over the proliferation of cybersquatting-
the Internet version of a land grab." Lewittes v. Cohen, No. 03 Civ. 189, 2004 U.S. Dist. LEXIS
9467 (S.D.N.Y. May 26, 2004).  Specifically, the ACPA was designed to focus on individuals
who "register well-known brand names as Internet domain names in order to extract payment
from the rightful owners of the marks . . .register well known marks to prey on consumer
confusion by misusing the domain name to divert customers from the mark owner's site to the
cybersquatter's own site, and target distinctive marks to defraud consumers, including to engage
in counterfeiting activities." Anti-Cybersquatting Consumer Protection Act ("ACPA"). S.Rep.
No. 106-104 at 5-6.

evaluated by the test promulgated by Judge Friendly in Abercrombie & Fitch Co. v. Hunting

World, Inc., 537 F.2d 4, 9 (2d Cir. 1976) pursuant to which marks are classified as either (1)

generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful.  See Knitwaves, Inc. v.

Lollytogs Ltd., 71 F.3d 996, 1007 (2d Cir. 1995).  At the low end are generic words -- words that

name the species or object to which the mark applies.  Id.  These are totally without

distinctiveness and are ineligible for protection as marks because to give them protection would

deprive customers of the right to refer to their products by name.  Id.  One rung up the ladder are

descriptive marks -- those that describe the product or its attributes or claims.  Id. at 13.  These

also have little distinctiveness and accordingly are ineligible for protection unless they have

acquired secondary meaning.  Id.  The next higher rung belongs to suggestive marks; these fall in

an in-between category.  Id. at 15.  They do not name or describe the product for which they are

used, but they suggest the qualities or claims of that product.  Id. at 16.  They are more

distinctive than descriptive marks, and thus are accorded trademark rights.  Id. at 17.

Nonetheless, because they seek to suggest qualities of the product, they possess a low level of

distinctiveness.  Id.  A mark is arbitrary or fanciful if there is no logical relationship whatsoever

between the mark and the product on which it is used.  Id.  However, even within the category of

arbitrary or fanciful marks, there is still a substantial range of distinctiveness.  Id.  Some marks

may qualify as arbitrary because they have no logical relationship to the product, but nonetheless

have a low level of distinctiveness because they are common. The most distinctive are marks that

are entirely the product of the imagination and evoke no associations with the human experience

that relate intrinsically to the product.  Id.; Nabisco v. PF Brands, Inc., 191 F.3d 208, 215-16 (2d

Cir. 1999), partly overruled on other grounds, 537 U.S. 418 (2003).  Only suggestive, arbitrary,

or fanciful marks are considered inherently distinctive.  See Knitwaves, 71 F.3d at 1007 n.27

The mark LEXAPRO® is arbitrary because the name has no logical relationship to the product for which it is used (antidepressants) and it is highly distinctive because it is entirely the product of imagination and evokes no association with a drug whatsoever. Merriam Webster's Collegiate Online Dictionary has no definition for LEXAPRO® and the PTO registered the mark LEXAPRO® on the Principal Register on February 4, 2003 without having to show that it had acquired distinctiveness through secondary meaning. Agovino Decl. ¶ 11. This fact creates a presumption that the mark is distinctive. Abercrombie, 537 F.2d at 17; TCIP Holding, 2004 U.S. Dist. LEXIS 13543, at * 14 (S.D.N.Y. July 19, 2004). The LEXAPRO® mark is unquestionably distinctive within the meaning of the ACPA.

**B.    Defendant Uses and Traffics In A Domain Name That Is Identical Or Confusingly Similar to LEXAPRO®**

The standard for "confusingly similar" in the ACPA is different from the "likelihood of confusion" standard adopted by Polaroid Corp. v. Polarad Electronics, Corp., 287 F.2d 492 (2d Cir. 1961). Under the ACPA, whether a domain name is confusingly similar to a trademark is to be evaluated without regard to the goods or services of the parties. Id. (quoting 15 U.S.C. § 1125(d)(1)(A)). A court must also disregard the top-level domain name (e.g. ".com", ".org", ".net", etc.). Omega S.A. v. Omega Eng'g, Inc., 228 F. Supp.2d 112, 126 n.36 (D. Conn. 2002). Courts consider whether the allegedly infringing domain name and the Plaintiff's mark could be confused and whether a user might reasonably assume that the domain name was "used, approved or permitted by the trademark owner." Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 25:78 (4th ed. 2002) ("in the cybersquatting context, "confusingly similar" must simply mean that the plaintiff's mark and the defendant's domain name are so similar in sight, sound, or meaning that they could be confused.").

The only difference between the respective marks is that LEXAPRO® contains an "a" while "lexipro.com" contains an "i." The marks look and sound virtually identical and while "lexipro" and LEXAPRO® are not precisely identical, there is no question that they are "confusingly similar" for purposes of the ACPA. <u>Freedom Calls Foundation v. Bukstel</u>, No. 05-5460, 2006 U.S. Dist. LEXIS 19685 (E.D.N.Y. March 3, 2006) (holding that Defendant's domain name "freedom calls" is confusingly similar to plaintiff's registered trademark FREEDOM CALLS FOUNDATION for purposes of the ACPA); <u>Wella Corp. v. Wella Graphics, Inc.</u>, 874 F. Supp. 54, 56 (E.D.N.Y. 1994) (finding new mark "Wello" confusingly similar to trademark "Wella"). <u>TCIP Holding Co.</u>, 2004 WL at *5 (holding that difference in one or two letters in domain name from Plaintiff's registered mark are inconsequential "slight variations").

Moreover, there is substantial evidence of actual confusion here. A search for "lexipro" on Google reveals dozens of instances where consumers thought "lexipro" and "LEXAPRO®" are the same drug. Second Agovino Decl. ¶ 3.

## C.    Defendant Had A Bad Faith Intent To Profit From LEXAPRO®

The ACPA lists nine non-exclusive factors to assist courts in determining when a defendant has acted with a bad faith intent to profit from the use of a mark. <u>Id.</u> at 1125(d)(1)(B)(i).[2] The Court is not limited to just those factors, which are expressly described as indicia that "may" be considered along with other facts. <u>Id.</u>

Defendant's actions reveal his bad faith even louder than his words.

---

[2] The Second Circuit has expressly held that "a bad faith intent to profit" are terms of art in the ACPA and are not necessarily equivalent with "bad faith" in other contexts. <u>Sporty Farm</u>, 101 F.3d at 499 n.13.

1.     **The Defendant Had No Trademark Or Other Intellectual Property Rights In Lexipro.Com Either Upon Registration Or At Any Time Thereafter**

The first ACPA indicia of bad faith is whether the Defendant had any trademark or other intellectual property rights in "lexipro.com" upon registration. 15 U.S.C. § 1125(d)(1)(B)(i)(I). There is no evidence that the Defendant ever attempted to obtain trademark or any other intellectual rights in "lexipro.com." A search of Defendant's name and "lexipro" or "lexipro.com" on the United States Patent and Trademark Office web site reveals no hits, which it would if Mr. Nissen had filed any trademark applications or if someone tried to register "lexipro" or "lexipro.com." Agovino Decl ¶ 4. Defendant could not have obtained any common law rights in lexipro.com because, by his own admission at the August 21, 2007 hearing, he admitted to never having used the name in connection with any bona fide business. Third Serbagi Decl., at ¶ 2, Ex. A, p. 5, lines 10-18.

2.     **Lexipro.Com Does Not Consist of the Defendant's Legal Name**

The second ACPA indicia of bad faith is whether the domain name is the legal name of the Defendant. 15 U.S.C. § 1125(d)(1)(B)(i)(II). That is clearly not the case here so this factor does not support Defendant.

3.     **Defendant Has Never Used Lexipro.Com in Connection With The Bona Fide Offering Of Any Goods Or Services**

The third ACPA indicia of bad faith is whether the Defendant ever used "lexipro.com" in connection with the "bona fide offering of any goods or services." 15 U.S.C. § 1125(d)(1)(B)(i)(III). Defendant admitted at the August 21, 2007 hearing that, although he purchased "lexipro.com" in 2002, he did not use it as a domain until 2005. Third Serbagi Decl. ¶ 2, Ex. A, p. 11, lines 4-14. Even then, by Defendant's own admission, all he did with "lexipro.com" from then until now is to "park" advertising on the site, rather than to use it as a

14

bona fide business which was purportedly his original intent.  Id.  Mr. Nissen stated at the

hearing:

> [A]s on December 15, 2004, I had not profited on it.  That means I
> owned the domain for all of 2002, all of 2003, and all of 2004
> without even knowing – without even once using it as a domain . .
> . It was not until basically 2005 that I put parking on it, because I
> decided there was absolutely no way this point I was going to be
> able to use it as an official business Web site.

Id.

### 4.    The Defendant Has Never Used the Mark In A Non-Commercial Fair Use Manner

The fourth ACPA indicia of bad faith is whether the Defendant has used the domain in a

non-commercial fair use manner.  15 U.S.C. § 1125(d)(1)(B)(i)(IV).  Not only has the Defendant

not made this claim, but stated at the August 21, 2007 hearing that he only used "lexipro.com" to

place advertising on it.

### 5.    Defendant Intended to Divert Consumers From Forest's LEXAPRO® Web Site To Defendant's Lexipro.Com Site For Commercial Gain

The ACPA's fourth indicia of bad faith is as follows:

> The person's intent to divert consumers from the mark owner's
> online location to a site accessible under the domain name that
> could harm the goodwill represented by the mark, either for
> commercial gain or with the intent to tarnish or disparage the mark,
> by creating a likelihood of confusion as to the source, sponsorship,
> affiliation, or endorsement of the site . . .

15 U.S.C. § 1125(d)(1)(B)(i)(V).  Although the Defendant claims that he first registered the

name in good faith, he admitted at the August 21, 2007 hearing that "I didn't find out until a few

months after buying it that it was probably going to be a problem with the fact that there was a

drug named for it or with a different spelling for the domain."  Moreover, Defendant specifically

selected the primary keyword "depression" to ensure that those who were interested in

15

LEXAPRO® would visit Defendant's site. That the Parked system selected the keywords

LEXAPRO® and CELEXA as a result of Defendant's selection reinforces his bad faith.

Defendant could have removed those words from his page but declined to do so.

This indicia of bad faith weighs heavily in Forest's favor. <u>Mashantucket Pequot Tribe v.</u>

<u>Redican</u>, 403 F. Supp.2d 184 (D. Conn. 2005) (holding that defendant intended to divert

confused consumers to his web site through typographical error or misrecollection of precise

spelling of Plaintiff's tradename).[3]

### 6. The Defendant Made Repeated And Unsolicited Offers to Sell Lexipro.Com to Forest Without Ever Having Had An Intent To Use the Domain Name In The Bona Fide Offering Of Goods or Services

The sixth indicia of bad faith under the ACPA is:

> the person's offer to transfer, sell, or otherwise assign the domain
> to the mark owner or any third party for financial gain without
> having used, or having an intent to use, the domain name in the
> bona fide offering of any goods or services, or the person's prior
> conduct indicating a pattern of such conduct.

15 U.S.C. § 1125(d)(1)(B)(i)(VI). Defendant's lack of intent to use lexipro.com in connection

with a legitimate business is well established, both by his own admissions and by Forest's

independent investigation. Defendant also made three independent and unsolicited offers to sell

"lexipro.com" to Forest. First, when Forest sent Defendant a cease and desist letter on August 1,

---

[3] The Fourth Circuit has stated: "because this evidence is so convincing, Factor (V) standing alone supports the district court's finding of bad faith intent on the part of Harrods BA." <u>Harrods Ltd. v. sixty Internet Domain Names</u>, 157 F. Supp.2d 658, 677-78 (E.D. Va. 2001). Courts have routinely granted summary judgment where the mark owner only established some of the factors. <u>Eurotech, Inc. v. Cosmos European Travels Akitiengesellschaft</u>, 213 F. Supp.2d 612 (E.D. Va 2002) (summary judgment in favor of mark owner where only five of nine ACPA statutory factors were clearly satisfied and "big picture" was fully consistent with finding of bad faith") <u>Cable News Network L.P. v. CNNEWS.com</u>, 177 F. Supp.2d 506 (E.D. Va. 2001) (same where only six of the nine statutory factors supported a claim of bad faith); <u>Victoria's Cyber Secret Ltd. P'ship v. V Secret Catalogue, Inc.</u>, 161 F. Supp.2d 1339 (S.D. Fla. 2001) (same where only seven of nine statutory factors favored finding of bad faith and one other "tipped slightly" in favor of trademark owner).

2007, Defendant responded by offering to sell the domain name for $10,000. Second, when

Forest sent a cease and desist letter to the "pay-per-click" site Parked.Com on August 14, 2007,

Defendant implicitly reiterated his request for money by threatening to place the domain on other

pay-per-click sites (which he subsequently did) and to sell the domain name to a pornographic

webmaster in Pakistan unless Forest started to be "reasonable" with Mr. Nissen. Third, on the

eve of Judge Swain's Order dated August 21, 2007 granting Forest's request for a TRO, Mr.

Nissen again wrote and requested that he "wanted a peaceful solution that gives me a fair payout.

. ." This ACPA Indicia of bad faith heavily favors Forest. <u>See</u> <u>TCIP Holding</u>, 2004 WL

1620950 at * 5 (holding that three offers to sell domain name to trademark holder was motivated

by bad faith).

### 7.    The Mark Incorporated Into Lexipro.Com Is Distinctive and Famous

The ninth[4] indicia of bad faith is the "extent to which the mark incorporated in the

person's domain name registration is or is not distinctive within the meaning of subsection (c)(1)

of Section 43." LEXAPRO® is highly distinctive for all the reasons already set forth herein.

Forest has solidly satisfied seven of the nine indicia of bad faith and the only reason it has

not satisfied the seventh and eighth factors is because no discovery has taken place. Courts have

found "bad faith" under far less egregious facts. <u>Freedom Calls Foundation</u>, 2006 U.S.Dist.

LEXIS 19685 at * 42-43 (finding bad faith intent to profit where owner of domain name

---

[4] The seventh indicia of bad faith is whether the Defendant maintained incorrect contact
information with the Registrar when applying for the domain name. 15 U.S.C. §
1125(d)(1)(B)(i)(VII) and the eighth factor is whether the Defendant has a history of acquiring
other domain names that are similar to marks that are distinctive when the Defendant registered
the domain names. Forest has no evidence to support the seventh and eighth indicia of bad faith,
but no discovery has taken place in this action. Cybersquatters are notorious for registering
domain names under a series of different names, which would render it impossible for Forest to
uncover this information.

"freedomcalls.us" intended to divert customers from FREEDOM CALLS FOUNDATION on-line site).

For all the foregoing reasons, the Court should find that the Defendant possessed a bad faith intent to profit.

### D. The Court Should Award Forest $100,000 of Statutory Damages and Its Attorney's Fees

The Court should award Forest $100,000 in statutory damages.

15 U.S.C. § 1117(d) provides that a plaintiff may elect to recover statutory damages in an amount not less than $1,000 and not more than $100,000 per domain name, as the court considers just. The highest award of statutory damages are entirely appropriate under the egregious facts of this case, including the threat to public safety posed by Defendant's acts, his dishonesty with Judge Swain at the August 21, 2007 hearing, his refusal to cease and desist his acts prior to this litigation, and his continued threats to sell the domain name to porn masters overseas unless Forest capitulated to his demands.

The Court should also award Forest its attorney's fees because this case is clearly exceptional under the Lanham Act. 15 U.S.C. § 1117(a) provides the Court the option to award reasonable attorney fees to the prevailing party in an exceptional case.

### E. The Court Should Transfer Lexipro.Com to Forest

The ACPA provides that in a civil action involving the registration, trafficking, or use of a domain name, the Court has the authority to Order the "forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C).

Forest respectfully requests that the Court transfer the domain name "lexipro.com" to Forest.

## II.    The Defendant Committed Federal Trademark Infringement Under 15 U.S.C. § 1114 and Federal Unfair Competition Under 15 U.S.C. § 1125

To prevail on an infringement and false designation of origin claims under §§ 32(1) or 43(a), a Plaintiffs must prove that it has a valid mark subject to protection and that the defendant's mark results in a likelihood of confusion.  Clinique Laboratories, Inc. v. DEP Corp., 945 F. Supp. 547, 550 (S.D.N.Y. 1988) (citing Gruner & Jahr USA Pub. V. Merredith Corp., 991 F.2d 1072 (2d Cir. 1993)).

Plaintiff has a federal registration on the Principal Register.  Forest's ownership of a registered mark is *prima facie* evidence of the mark's validity, and of Forest's exclusive right to use the mark in commerce in connection with the goods identified in the registration certificate. 15 U.S.C. §§ 1057(b), 1115(a).  A likelihood of confusion is presumed as a matter of law when a defendant intentionally copies a plaintiff's trademark.  Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987);   In this case, as set forth herein, there is ample evidence that the Defendant intentionally copied Forest's mark.  This evidence includes, but is not limited to: (i) the heavily touted entry of LEXAPRO® into the market prior to the time when Defendant registered his "lexipro.com" domain name"; (ii) the arbitrary and distinctive nature of the LEXAPRO® mark, and the unlikelihood that one would independently coin a very similar term; (iii) Defendant's use of the term "depression" as a primary keyword; and (iv) Defendant's admission in open Court that he learned about LEXAPRO® prior to using his domain name in commerce.

Confusion that occurs prior to a sale may also be actionable under the Lanham Act.  One such type of actionable pre-sale confusion, "initial interest confusion," occurs when a consumer, seeking a particular trademark holder's product, is instead lured away to the product of a competitor because of the competitor's use of a similar mark, even though the consumer is not

actually confused about the source of the products or services at the time of actual purchase.  See Mobil Oil, 818 F.2d at 260.[5]

In the Mobil Oil case, the district court found that plaintiff oil company would be harmed by "the likelihood that potential purchasers will think that there is some connection or nexus between the products and business of [defendant] and that of [plaintiff]." 229 U.S.P.Q. at 894.  On appeal, the Second Circuit upheld the district court's finding, noting specifically that the district judge had found a likelihood of confusion not in the fact that a third party would do business with Pegasus Petroleum believing it related to Mobil, but rather in the likelihood that Pegasus Petroleum would gain crucial credibility during the initial phases of a deal. For example, an oil trader might listen to a cold phone call from Pegasus Petroleum--an admittedly oft used procedure in the oil trading business--when otherwise he might not, because of the possibility that Pegasus Petroleum is related to Mobil.  Mobil Oil, 818 F.2d at 259.

District courts in this circuit have noted that, on the Internet, initial interest confusion occurs when "potential consumers of one website will be diverted and distracted to a competing website." Bihari v. Gross, 119 F.Supp.2d 309, 319 (S.D.N.Y. 2000) ("In the cyberspace context, the concern is that potential customers of one website will be diverted and distracted to a competing website. The harm is that the potential customer believes that the competing website

---

[5] See Grotrian, Hellferich, Schulz, th. Steinweg Nachf. V. Steinway & Sons, 523 F.2d 1331, 1342 (2d Cir. 1975) (finding harm to defendant in the likelihood that a consumer, upon hearing plaintiff's name and thinking it had some connection with defendant's name, would consider plaintiff's product on that basis, since plaintiff's name would attract potential customers based on the reputation built up by the defendant for many years); Lois Sportswear, USA v. Levi Strauss & Co., 799 F.2d 867, 872 (2d Cir. 1986) (acknowledging that the likelihood of confusion among potential customers is actionable harm under the Lanham Act); Jordache Enters., Inc. v. Levi Strauss & Co., 841 F. Supp. 506, 514-15 (S.D.N.Y. 1993). ("Types of confusion that constitute trademark infringement include where … potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase".)

is associated with the website the customer was originally searching for and will not resume searching for the original website."); Big Star Entertainment, Inc. v. Next Big Star, Inc., 105 F. Supp.2d 185, 207 (S.D.N.Y. 2000) ("The concern is that many of those initially interested potential customers of plaintiff's would be diverted and distracted by defendants' site and would either believe that defendants' site is associated with plaintiff's or would not return to plaintiff's domain."); Planned Parenthood Federation of America Inc. v. Bucci, 1997 U.S. Dist LEXIS 3338 (S.D.N.Y. March 19, 1007) (Defendant's use of domain name and home page address similar to plaintiff's mark "on their face, causes confusion among Internet users and may cause Internet users who seek plaintiff's web site to expend time and energy accessing defendant's web site.").

In the present case, the harm to Forest from initial interest confusion lies not in the loss of Internet users who are unknowingly whisked away from Plaintiff's website; instead, harm to the Plaintiff from initial interest confusion lies in the possibility that, through the use of Defendant's domain name "lexipro.com," Defendant "would gain crucial credibility during the initial phases of a deal." Mobil Oil, 818 F.2d at 259. The law in no way requires that a consumer be unaware that he or she is being drawn to another online location.

Even if the customer quickly becomes aware of the competing source's actual identity and can rectify the mistake, the damage to the first user that the courts have identified manifest in three ways: the original diversion of the prospective customers' interest; the potential consequent effect of that diversion on the customer's ultimate decision whether or not to purchase caused by an erroneous impression that two sources of a product may be associated; and the initial credibility which may be accorded by the interested buyer to the junior user's products--customer consideration that otherwise may be unwarranted and that may be built on the strength of the senior user's mark, reputation and goodwill. Big Star, 105 F. Supp.2d at 207.

21

Court analyze the eight factors articulated by the Second Circuit in <u>Polaroid Corp. v.</u> <u>Polarad Electronics Corp.</u>, 287 F.2d 492, 495 (2d Cir.), <u>cert denied</u>, 368 U.S. 820 (1991) for determining likelihood of confusion indicates that a strong likelihood exists.   <u>See Estee Lauder</u> <u>Inc. v. The Gap, Inc.</u>, 108 F.3d 1503, 1510-12 (2d Cir. 1997).

First, the LEXAPRO® is a very strong and highly distinctive mark for the reasons already set forth herein.

Second, there is a high degree of similarity between Forest's LEXAPRO® mark and the Defendant's domain name "lexipro.com." There is no evidence that arbitrary and distinctive LEXAPRO® mark existed before it was coined and used by Forest and the very minor visual differences between Forest's mark and Defendant's domain name becomes nonexistent when the marks are spoken.

Third and Fourth, the products at issue in this case – the on-line pharmacies advertised by Defendant (which offer bootleg LEXAPRO) and the LEXAPRO® product are identical.  As a result, there is no market gap for the Defendant to bridge. The distribution channels in this case -- cyberspace – are also identical.  Further, the cyberspace medium renders it especially difficult for consumers to evaluate any quality differences between Forest's and the Defendant's products.

Fifth, actual confusion is presumed here because all the evidence presented herein proves that the Defendant acted in bad faith and the Internet hits for "lexipro.com" as a search term reveal dozens of instances of consumers confusion.

Sixth, it is plain that the defendants are guilty of bad faith. Their use of the domain site that copied Forest's LEXAPRO® mark was a deliberate bad faith effort at cyberpiracy.

Seventh, it appears that defendants' products are not thought to be the same quality as the

plaintiffs' products, although this is often not the case.

Finally, it is doubtful that consumers who are willing to buy bootleg drugs from on-line pharmacies are sophisticated buyers. Hence, all of the Polaroid factors point to a likelihood of confusion.

Having established a likelihood of confusion, the plaintiffs have satisfied the second prong of their trademark infringement claims. Thus, the plaintiffs have successfully proven a likelihood of success on the merits of these claims.[6]

III.  **Defendant's Registration and Use of "Lexipro.Com" Constitutes Common Law Trademark Infringement and Unfair Competition**

The same analysis is used for common law trademark infringement and unfair competition cases as is used under federal law.  See Safeway Stores, Inc. v. Safeway Props., Inc., 307 F.2d 495, 498 n.1 (2d Cir. 1962); Pfizer, Inc. v. Y2K Shipping & Trading, Inc., No. 00-cv-5304, 2004 WL 896952, at *2 (E.D.N.Y. March 26, 2004).  Therefore, since Forest has established infringement and unfair competition claims under the Lanham Act, it has necessarily also done so under common law.  See Baker v. Parris, 777 F. Supp. 299, 304 (S.D.N.Y. 1991).

IV.  **Defendant's Registration and Use of "Lexipro.Com" Constitutes Deceptive Trade Practices Under N.Y. Gen. Bus. Law § 349**

Defendant's registration and use of the domain name "lexipro.com" also constitutes deceptive practices under N.Y. Gen. Bus. Law § 349(a), which makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service

---

[6] In the realm of trademark infringement and unfair competition, "permanent injunctive relief will be granted if the court finds a likelihood that purchasers of the product may be misled in the future." Collins v. Aztar Corp., No. 99 Civ. 7912, 2000 U.S. App. LEXIS 4484, * 6 (2d Cir. Mar. 20, 2000).  A plaintiff in a trademark infringement case must demonstrate actual success on the merits and irreparable harm to obtain a permanent injunction. Hard Rock Café. Int'l. (USA) Inc. v. Morton, No. 97 Civ. 9483, 1999 U.S. Dist. LEXIS 13760, at *13-14 (S.D.N.Y. Sept. 8, 1999). In this Circuit, a finding of likelihood of confusion generally establishes irreparable harm. See Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 142 (2d Cir. 1997).

in this state . . . ."  To establish a claim under this section, a plaintiff must show that (1) defendant's conduct is consumer-oriented, (2) defendant is engaging in an act or practice that is deceptive or misleading in a material way, and (3) that plaintiff has been injured as a result. Cohen v. JP Morgan Chase & Co., No. 06-0409, 2007 WL 2231106, at *13 (2d Cir. August 6, 2007).  Proof of intent to defraud or mislead is not required, but if present, permits the court to treble damages up to $1,000.  Id.  And corporate plaintiffs have standing to sue so long as some harm to the public is at issue.  Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995).  Specifically, offenses to the public interest that would trigger Federal Trade Commission intervention are covered by this section.  Id. at 264-65.

Defendant's actions satisfy all of these elements.  First, they are consumer-oriented. Defendant registered and used a domain name that was available to anyone with access to the internet.

Second, Defendant's conduct was deceptive and misleading in a material way.  In particular, Defendant admittedly tried to misdirect internet traffic from Forest's legitimate "lexapro.com" website to "lexipro.com."  Defendant accomplished his goal by (1) registering a common misspelling of Forest's famous LEXAPRO® trademark, and (2) choosing "depression" as a search engine keyword, so that internet users who typed "depression" into a search engine would be directed to "lexipro.com."  These actions were likely to cause confusion as to the source of the "lexipro.com" domain name, as well as the source of the links that were displayed on "lexipro.com."

Third, Forest has been injured as a result of Defendant's actions.  Defendant registered and used the "lexipro.com" domain name in bad faith, which damaged the good will associated with the famous LEXAPRO® trademark.  Further, by misdirecting consumers to online

24

pharmacies that are selling unauthorized versions of LEXAPRO®, Forest likely suffered pecuniary damage as well.

And finally, Defendant's actions raise serious public safety concerns. Defendant's "lexipro.com" was linked to several online pharmacies that are illegally selling drugs that purport to be LEXAPRO®. The sale of unregulated drugs by rogue online pharmacies presents a well-established public safety issue that is currently under government investigation. Indeed, the U.S. Attorney's Office recently noted in a press release announcing a 313-count indictment against individuals that allegedly ran an online pharmacy that, "The fraudulent and illegal sale of prescription drugs over the Internet poses a serious threat to the health of Americans who turn to the Internet in their need for pharmaceuticals." By intentionally misdirecting consumers away from Forest's legitimate website to his website that contained links to online pharmacies that are illegally selling drugs to American consumers, Defendant's conduct was clearly in disregard for public safety.

## CONCLUSION

For all the foregoing reasons, Forest respectfully requests that the Court grant the relief requested herein and such other relief as the Court may deem just and proper.

Dated:  New York, New York
       August 29, 2007

                                  Respectfully Submitted,

                                  By: _____
                                  CHRISTOPHER SERBAGI, ESQ.
                                  Law Offices of Christopher Serbagi
                                  488 Madison Avenue, Suite 1120
                                  New York, New York  10022
                                  (212) 593-2112

                                  Attorney for Plaintiffs